The opinion of the court was delivered by
Manning, C. J.
Levi and Margaret Barfield, husband and wife, were Jiving in 1850 in Franklin parish, upon a plantation of their own, surrounded by the appliances of comfort, and even of luxury, that befitted persons who by patient toil and prudent management had obtained the means to procure them. Three children had survived of the larger number that was born to them — Celia, Isabel, and Ira. In that year, a young man named Harrington came into that neighbourhood, and sought ■to obtain the patronage of parents in the establishment of a school. He found encouragement, and the unwary father of Celia permitted him to open a school at his house or on his premises. Harrington had a fair exterior, and plausible address, and possessed an accomplishment which in the rough life of a sparsely settled and imperfectly cleared country *1298 such as that locality then was, gave him the entrée to society, and made him the visitor, more desired than all others, to the country dances and social gatherings of the neighbourhood. He was a musician, and his instrument was the violin.
Celia Barfield was then in the first bloom of mature womanhood. Whether any thing had transpired to awaken her father’s suspicions, we-have now no means of positively knowing, but Harrington left Mr. Bar-field’s, and went to another place, not far distant, and opened another school. There is little doubt that the father had discovered his mistake-in permitting this attractive adventurer to live under his own roof, and sought to repair the probable injury by sending him away. Not many months elapsed before he had to bemoan the effects of his fatal error.
In April 1851 there was a festive gathering in the neighbourhood. Celia Barfield left the house of her parents, bedecked for the evening’s-sport. They never saw her again. Harrington met her at the dance, and the two thence rode away, and were married by a justice of the peace. They were attended by those to whom their secret intentions had been made known, and among them'was an uncle by marriage of the infatuated girl, who has lived to tell on this trial the story of his niece’s dishonour,, and his own shame.
About two months after the marriage, Harrington was charged with shooting at a man for some cause, and was arrested' and examined before a magistrate, and discharged. This circumstance occasioned the usual flood of eager small-talk in a country neighbourhood, and among it, was the whisper — appalling to the Barfields and their daughter— that Harrington had a living wife in Mississippi then. This was spoken of as a rumour, but there was no one then who undertook to assert it. Harrington determined to move away. He left in July, giving as a reason his fear that the man who had him arrested for the alleged shooting would have him indicted. Celia had worn the name of wife two and a half months, and was already sufficiently advanced in pregnancy to attract notice. This rumour of Harrington’s previous marriage, and of his living wife, reached her ears. She asked him about its truth. He denied that his first wife was living. He had represented himself as a-widower on his first appearance there. He asseverated that his first-wife was dead, and she believed him. It is strange, she said, that every one knew that Mr. Harrington had another living wife, now that she was married to him, and had not found it out before. She declared her disbelief in the story, and went with him to his new home. That was Magnolia, in Arkansas.
In 1875 another stranger appeared in this same locality, bearing the same family name, with the baptismal prefixes of that uncle’s name, who had assisted in the elopement of twenty-four years before. He *1299 said he was the eldest and only surviving child of the school-teacher and Oelia Barfield — the same that she bore in her womb when she left the place to which he had now come for the first time. Many changes had taken place. Levi Barfield had been dead many years. Margaret, his widow, had husbanded the property with unusual success — had increased it, so that the plantation of twelve hnndred acres, and the movable property, and slaves, had become valuable. She survived the war, and though the estate of course suffered great deterioration, when she died on the last day of 1870, there was enough to satisfy moderate wants.
Ira Barfield, her only son, and Is.abel, her daughter, now the wife of John M. Gwinn, took possession of the property, formally accepted the succession unconditionally in January 1871, and in the following December partitioned it between themselves. Each was in the enjoyment of the one half of the property of their father and mother, when this stranger, claiming to be the son of their sister, appeared on the scene. He had been in this State two or three years, but did not know in what particular part of it his mother’s family lived. His father had found a third wife in Arkansas, after Oelia Barfield’s death, and this last wife was a widow with a daughter by a previous marriage, who had grown up, married, and come down to the neighbourhood, and it was from her that he had found out where the Barfields lived. His mother’s death had occurred a few years after the removal to Arkansas. His father had told him his mother’s name, and that he would be entitled to some property in Louisiana at some future day, but he knew nothing more. He was very young, hardly old enough to be told or to remember any thing but such salient facts as his mother’s name and birthplace. The father himself had died before he imparted his singular story to the son. The war had broken out, and William Harrington in some measure atoned for his violation of the laws of his country by flying to her defence. He perished, a victim to the fevers of the camp at Corinth.
Young Harrington told his story to Ira Barfield, who listened with half-yielding credulity, but warned him that better proof was needed than his narrative, however probable, before he could be recognised as Celia’s son, or as such, be entitled to Celia’s inheritance. Isabel scouted his whole story. He was an impostor, not the son of her sister — but even if he were, he was conceived in shame, born in disgrace, and was now flouting the pretensions of an adulterous bastard to share the Barfield property in the faces of those whom his mother had dishonoured. The reception which this brother and sister gave to the son of the dead woman is characteristic.
Both the exception and answer of Mrs. Gwinn contest the pretensions of the plaintiff on these grounds, and the other defendants adopt *1300 her defences as their own. There are also other grounds of exception; — • that Harrington is suing for recognition as heir, and for the partition of succession property, and that the parish court has exclusive jurisdiction of these questions, being probate in their nature.
It was said in Le Page v. N. O. Gas Co. 7 Rob. 183, that the recognition of an heir before the probate court is required only when he is seeking to compel an executor or other representative of a succession to render an account. When he is demanding his share of the succession from other heirs, and his heirship is contested, he can as well offer the proofs of that heirship in a suit in the district court as in the probate tribunal. A circuity and multiplicity of actions is avoided by that means. The second exception is equally untenable. This is a petitory action, coupled with a demand for the value of movables, and for rents and profits. The succession of the deceased Barfields had ended some years before the institution of this suit, and was no longer in existence to be partitioned.
The heirship of the plaintiff is put at issue by the defendants. They deny that he is their sister’s child, or if he is, that his parents were legally married. They aver that William Harrington had a wife then and now living, whose name is Matilda J. Kelly, and that Celia Barfield knew it when she went through the mock ceremony — that the flight to Arkansas was because of a threatened prosecution of Harrington for bigamy, and the birth of three children, of whom plaintiff is the only survivor, shews their mother’s persistence in the illicit cohabitation with Harrington after she knew that she was not his lawful wife. They allege that the plaintiff is an adulterous bastard, and cannot lay claim to the inheritance of their parents.
The whole controversy turns upon the good or bad faith of Celia Barfield — upon her knowledge or ignorance of the previous marriage of Harrington at the time of her own marriage, and of the conception of this, her first child. It is necessary therefore to examine the law applicable to this question, and then to ascertain whether she was in such a position, as to enable her son to legally claim her portion of her parents’ property.
The marriage was in April 1851. The plaintiff was born on 9th. December of the same year, between seven and eight months after the marriage. Our Code declares that the child which is born before the one hundred and eightieth day after the marriage, and which is capable of living, is not presumed to be the child of the husband. The same rule applies to the child born three hundred days after the dissolution of the marriage, arts. 205-6. new nos. 186-7. The plaintiff was bom within those periods, and we will charitably assume, as the law does, that he was begotten in wedlock.
*1301 To what extent the good faith of one of the parties will cause a null marriage to produce civil effects, and what is the reasonable belief that party must have of the absence of legal impediments, is thus stated by Mareadé ;—
les principes de requité, et la thóorie juridique, et l’historique de la redaction du Code, tout prouve quetous les manages nul, c’est-á-dire, ceux proprement mils ab initio, aussi bien que ceux rendus nuls parda cassation, doivent produire les effets civils d’un mariage valable, quand il y a eu bonne foi. .
O’est sous la condition de la bonne foi des époux, ou de l’un d’eux, que le mariage nul produit les effets civils; et cette condition est la seule qu’exige la loi. Cette bonne foi consiste dans la pensée, erronóe mais raisonnable, chez la personne, que le mariage qu’elle contractait ótait vraiment valable devant la loi.
Nous disons pensée raisonnable. Ainsi, on ne pourrait pas reconnaitre la bonne foi, l’ignorance pardonnable, chez celui qui viendrait dire qu’il ne savait pas qu’un méme homme ne peut pas avoir plusieurs femmes ; * * * En effet, on sait partout dans le monde que la bigamie est punie comme un crime * * * Oe qu’il faut toujours exiger, mais aussi 1’unique chose qu’on doive exiger, c’est l’ignorance vraiment pardonnable de l’existence ou de l’effet legal du fait qui s’opposait á la validitó ou á la formation du mariage ; c’est pour rópóter la régle deux fois exprimée, qu’il y ait en bonne eoi. Tout se reduit a cela; et comme c’est la un point de fait qui dépend, pour chaqué espéce, des milles circonstanees de l’espéce, nous ne concevons guére l’attitude des cent et une questions que les auteurs ont agitées sur ce point. II est abandonné tout entier au pouvoir diserétionnaire du juge. JSxplic. du Code Napoleon, 1 vol. 520.
Olendenning’s case, 3 New Series, J38, declares the broad doctrine that the woman who was deceived by a man who represented himself as single, and his children begot of her while the deception lasted, are bona fide wife and children, and as such, entitled to all the rights of a legitimate wife and issue. It should be stated however that a marriage had preceded the birth of a child in that case, as in this, the first wife being still living, and the first child was born within four months from its celebration, which circumstance Martin, J., treating of the good faith of the woman, thinks may be evidence of too much faith in her, but adds, as a lawful marriage cures an irregularity of that kind, a bona fide one on the part of the deceived woman must have the same effect.
Patton v. Philadelphia, 1 Annual 98, is a remarkable case, where the questions now before us, were well considered. Abraham Morehouse left Abigail Young, his lawful wife, whom he had married in 1790 in New York, and their two children, and came to the Spanish colony of Louisi *1302 ana. He said he was a widower, and in 1799 agreed to take Elénore Hook as his wife. There was no priest to be had, and the two signed an Act before the commandant of the post, in which their intention was expressed. That was the custom of the colony. In 1805, Morehouse acquired four tenths of the land grant of twelve leagues square, made by the Spanish Government to the Baron de Bastrop, and died in 1813, his two wives being then alive, and each one having living children by him. The parties to the suit derived title from these two families — the plaintiffs from Elénore Hook’s children, the defendants from Abigail Young’s, through Stephen Girard.
Morehouse had refused to solemnize his marriage afterwards when a priest was at hand, and the court held that it was valid without the solemnization, and that Elénore was his lawful wife ás long as she remained in good faith, and cite the Spanish law to the effect, that absolute ignorance of the existence of the impediment to a lawful marriage is not essential, but children, begotten during the existence of a doubt touching the impediment, will be legitimate.
There were general reports current in the country in relation to the first wife being alive, and Elénore once asked the commandant’s wife about them, and was told not to believe them. Celia Barfield was told by her husband the same thing under very similar circumstances, but the defendants insist that she knew of his first marriage and the living wife, before her own marriage. The most damaging testimony to Celia is their witness, Mrs. Evans, her aunt, who lived in the Barfield neighbourhood, and who sajrs ; she “had heard that Harrington was a married man before this marriage with Celia, and that she had told Celia of the rumour before she ran away with him — that she had heard Celia’s father and mother tell her (Celia) that Harrington was a married man, and that Celia had heard it more than once before her own marriage with him.”
On the other hand, two men who w'ere conspicuous actors in the elopement testified that there 'were no rumours in the neighbourhood of •any living wife of Harrington, and that no one, so far as they knew, suspected or had reason to suspect that Harrington was not a widower as he represented himself to be. Lucien H. Villard, the uncle by marriage of Celia, protests that he would not have assisted his niece to the marriage had he suspected or heard of such a thing, but we can very well be distrustful of a man’s notions of propriety who confesses himself to have been so unmindful of decency and good feeling, as to help in bringing upon his wife’s sister and household the anguish and the shame which their daughter’s flight could not fail to do. Dyson, now the patriarch of the neighbourhood, who also lent a helping hand on the elopement night, says he would certainly have heard the rumour of *1303 Harrington’s having a living wife, if there had'been any such rumour, tout there was none. Moses Evans is the husband of that aunt, whose strong reiterations of Oelia’s previous knowledge of the first wife’s existence we have mentioned. He knew Harringto'n well, and lived near the Barfields. He says there was never any report in the neighbourhood •about his having another living wife until about a month or so after the marriage. It is not credible that Mrs. Evans had heard such report and never told her husband. Such an appetizing piece of gossip could not have been kept to herself. The good woman has confounded the time, as it is natural she should, and that her memory is not to be trusted is conclusively demonstrated by the statement she made, a short time before this suit was filed, to one of the attorneys that Oelia Barfield would never have married Harrington if she had known he was already a married man. Eive other witnesses corroborate these as to the absence of any rumour of Harrington’s living wife before his marriage with Celia. It was not long after that event that the rumour became rife, and it ■soon developed into certainty.
Levi Barfield, the stricken father, had already determined to free his mind from any harassing doubts upon this matter, and had sent Moses Evans’ father over to Mississippi to learn the truth. He found the •first wife, Matilda Kelly. Then Mr. Barfield went, and assurance was made doubly sure.' Then it was that Mr. Barfield sent the female members of his family as emissaries to his daughter, to tell her the appalling truth he had learned, and to conjure her to quit the man who had so foully betrayed her, and come back to the home she had so inconsiderately left. Her answer was — “ I will follow William Harrington never mind how many wives they say he has.” She could have said nothing else, even if she believed what they had told her. What could she do but cling to the father of the unborn child, whose advent might throw suspicion on her ante-nuptial virginity. She best knew whether that child might be expected to see the light before the usual period of gestation had elapsed from the marriage. But there is every reason to suppose that she did not believe the story about the first wife then, and that her exclamation that she would follow Harrington was only the outbust of angry defiance of her tormentors. Naturally she would ask herself — how is it possible for this Matilda Kelly to be his wife, when she does not bestir herself to pursue him. She would not have far to come. She knows where the second wife is, and how can it be conceived that she can deny herself the revenge, and spare him the punishment, of personally confronting the guilty husband, and by her presence placing an insurmountable barrier between him and the hapless girl whom he has vainly sought to put in her place.
Marcadé says, c’est seulement au moment de la célébration du *1304 manage que la bonne foi est nécessaire, et alors méme que les époux seraient restés unis longtemps encore aprés la découverte de l’erreur, cette bonne foi primitive suffirait et produirait les mémes effets que si elle avait continué jusqu’á la declaration de nullité. La loi devait étre indulgente en pareil cas. Explication, Ibid. 521.
But the testimony leaves the impression on our minds that Celia, never believed the story that was told her, and the death of all the children but the plaintiff leaves no question for consideration but her good faith at and before the time this plaintiff was conceived.
We think her good faith is proved far beyond the requirement of the law as approved by this court in Morehouse’s case. If children begotten during the existence of a doubt as to any impediment, and before doubt has given place to' certitude, are held to be entitled to the-rights of legitimate heirs, a fortiori must this child who was conceived before doubt began, be held entitled to the same rights. It is not improbable that Celia Barfield continued in disbelief of this story in Arkansas. No one troubled himself about it. No one pursued him, and so ignorant was the community there of it, that after her death he married there a third wife, who is living and is one of the witnesses to the filiation of the plaintiff on this trial. Two of this man’s wives have survived him.
The plaintiff’s counsel say : It is not an insignificant, circumstance that Levi and Margaret Barfield both died without disinheriting Celia.. If they had believed, or had reason to suspect that she knew of Harrington’s first wife when she married him, they would not have left their other children to the uncertainty of being confronted by her issue,, claiming a right to their property. But the probability is that neither of these people thought of wills or disinherison, or knew anything about, the law regulating the rights of Celia’s children. Their simple way of looking at it was from the moral standpoint, and no doubt they thought a man that had one wife could not, outside of a Mohammedan country, have another in law, and any children born of such other wife were bastards, and were in the expressive language of the old law, the children of nobody.
As good faith is imputed to the mother of the plaintiff, until the contrary be clearly shewn, so must it be imputed to Ira Barfield and his-sister Isabel in their possession of the property under the belief that no other heir was in existence. There was nothing to induce them to believe that any one was in existence who could rightly claim any portion of their parents’ succession but themselves. They knew nothing of Celia’s subsequent history, and Celia’s son knew so little of them that it was many years before he found out the locality of his mother’s marriage, and the home of her family. Celia had not been heard of by her *1305 family for nearly a quarter of a century, and her brother and sister are-entitled to the benefit of their plea of prescription. The defendants are-not chargeable with the rents and revenues of the property which they possessed and used as sole heirs in good faith, before notice waabrought home to them of the existence of an heir, previously not heard of. This suit was instituted in the latter part of 1875. The verdict of the jury gave the plaintiff the rents only for 1876 and 1877. They found in hi» favour as heir, and awarded him one third of the property, and we think correctly. Therefore
It is ordered and decreed that the judgment of the lower court is-affirmed.